UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:20-CV-158 (WOB-CJS)

ROBERT REED                                              PLAINTIFF

VS.                    <u>MEMORANDUM OPINION AND ORDER</u>

CAMPBELL COUNTY, KENTUCKY,
ET AL.                                                  DEFENDANTS

This is a lawsuit filed by Robert Reed against Officers
Michael Curtis and Kyle Gray, both in their official and individual
capacities, and Campbell County, Kentucky, for violations of his
constitutional rights stemming from an incident at his home in
April 2020. Currently before the Court are the parties' cross-
motions for summary judgment. (Docs. 39, 41).

The Court has carefully reviewed this matter and, being
advised, now issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

### A. The 911 Call

Just before 9:00 PM on April 11, 2020, the Campbell County
dispatch center received a 911 call from someone reporting a
domestic dispute. (Doc. 60-1 at 2). The caller identified herself
as "Jennifer," but did not provide a last name. (*Id.* at 3:4).

The caller began by telling the dispatcher that she was in
her backyard and said that the people who live behind her were
having an altercation of some sort. (*Id.* at 2:2-5). She said, "I

1

don't know if they're having a domestic dispute or what." (*Id.*).
When the dispatcher asked if the caller knew the address, the
caller responded, "Yes. It is 7 South Cottonwood" before clarifying
that it was not her address but "their address." (*Id.* at 2:6-13).

The dispatcher then asked if the dispute was inside or
outside, and the caller responded, "It sounds like he's outside.
They've got a couple of dogs, and I can't tell if they're yelling
at the dogs or —." (*Id.* at 2:15-17). The dispatcher then asked,
"Does it sound verbal or physical or both?" to which the caller
responded "both." (*Id.* at 2:18-20).

The caller proceeded to tell the dispatcher, "I don't know if
he's yelling at dogs or if he's yelling at humans or if it's both,
but it sounds like he's getting both physical as well as —." (*Id.*
at 2:23-3:1). The call concluded with the caller reiterating, "I
haven't seen or heard anything . . . I can't really see anything.
I — I just heard him yelling and what sounds like him hitting
something. I don't know — again, like I said, I don't know if he's
hitting dogs or if he's hitting humans." (*Id.* at 3:7-12).

The dispatcher communicated via the police radio: "7 South
Cottonwood for a domestic. Caller's advising it sounds like they're
outside (inaudible) verbal and physical." (*Id.* at 3:20-23).

The dispatch center also maintains a blotter, which is an
electronic system for dispatchers to type in additional incident
information. (Doc. 36, Fuller Dep. at 41:22-25). The dispatcher

2

made two blotter entries while the officers were en route to the house. The first said, "Domestic at this address. Sounds like they're outside. Sounds verbal and physical." (Doc. 39-2 at 1). The second said, "Caller advising she doesn't know if male is yelling at and getting physical with a person or the dogs." (*Id.*). The dispatcher testified that this information would have been accessible to the responding officers on their computer monitors inside the cruisers. (Doc. 36, Fuller Dep. at 60:18-22).

### B. Officers Gray and Curtis Respond

Officers Gray and Curtis were the Campbell County Police officers who responded to the call at 7 South Cottonwood—which is now known to be the home of Plaintiff Robert Reed. Campbell County Police Department policy requires that two officers respond to reports of domestic violence. (Doc. 48-1 at 3).

The officers' body cameras were engaged during the incident and have been entered into the record. When the two officers arrived, they exited their respective cruisers and approached the house. (Doc. 39-3, Gray Body Cam. at 0:31; Doc. 39-4, Curtis Body Cam. at 0:38). Both officers testified that they did not see or hear anything as they approached Plaintiff's home that would have suggested a fight had recently occurred or was ongoing. (Doc. 31, Curtis Dep. at 70:19-71:17; Doc. 32, Gray Dep. at 89:8-13).

Officer Curtis walked around to the right side of the house and, finding nothing out of the ordinary, returned to the front

porch area. (Doc. 39-4, Curtis Body Cam. at 0:55–1:22). Officer Gray walked onto the front porch and peered through a front window. (*Id.* at 1:22–27). The front window blinds were open, and Gray could see that the front room light was off while the back dining area light was on. (Doc. 39-3, Gray Body Cam. at 1:07). But he could not see anyone in the house from his viewpoint. (*Id.*). Gray then said to Curtis, "I can't tell if somebody is on the back porch or not." (*Id.* at 1:15–17; Doc. 32, Gray Dep. at 98:15–22).

The officers made their way to the left side of the house. (Doc. 39-3, Gray Body Cam. at 1:18–28; Doc. 39-4, Curtis Body Cam. at 1:28–38). Gray questioned Curtis, "I thought they said they were outside, no?" (Doc. 39-3, Gray Body Cam. at 1:20–21; Doc. 32, Gray Dep. 99:9–11). Curtis responded, "That's what they said." (Doc. 39-4, Curtis Body Cam. at 1:33). The officers walked to the left side yard but saw nothing out of the ordinary. (Doc. 39-3, Gray Body Cam. at 1:31–1:58; Doc. 39-4, Curtis Body Cam. at 1:44–2:14).

The officers both returned to the front porch and Gray pulled open the screen door and knocked on the door. Curtis positioned himself to the right of the front door so that he could see through the front window. (Doc. 39-4, Curtis Body Cam. at 2:30–2:45). Curtis's body camera shows a door opening toward the back of the house, and he told Gray "There's somebody . . . there's a guy coming to the door." (*Id.* at 2:37–2:48).

4

As Reed walked toward the door, Curtis also relayed to Gray that, "There's a female in the back bedroom." (*Id.* at 2:51–52). Curtis testified that he saw a woman—now known to be Marsha Reed—come out of the back room with Reed and linger in the hallway. (Doc. 31, Curtis Dep. at 84:2–9). He testified that the woman "seemed kind of standoffish, kind of timid," which he had seen before in domestic violence victims. (*Id.* at 83:12–21).

### C. The Altercation Itself

A man—now known to be Plaintiff Robert Reed—opened the front door. (Doc. 39-3, Gray Body Cam. at 2:40). Gray asked Reed, "Do you mind stepping out here and talking to me for a second, sir?" (*Id.* at 2:41–44). Reed responded by asking Gray, "Uh, you got a warrant?" (*Id.* at 2:45–46). Gray responded "nope" and Reed followed-up by asking "What's this about?" (*Id.* at 2:46–2:49). Gray explained that "somebody called and said that someone was fighting and arguing over here." (*Id.* at 2:50–2:52). Reed responded, "Wasn't here. Sorry, Officer." (*Id.* at 2:53–55).

Gray then asked Reed if anyone else was inside the home. (*Id.* at 2:56). Reed responded "yes, but do you got a warrant?" (*Id.* at 2:57–2:59). Reed then told the officers that they "don't have probable cause." (*Id.* at 3:01–03). Gray responded that they do have probable cause and that he has been nothing but respectful so far. (*Id.* at 3:03–09). Reed responded, "I know, I just don't want

5

to deal with any officers in my house. I don't know who called, and I don't really care." (*Id.* at 3:07–14).

Gray continued to insist that he speak with the other occupants of the home.[1] He said, "if there's any other adults in the house, I need to talk to them." (*Id.* at 3:22–3:25). He warned that "if not, then we can come in, because it's called exigent circumstances." (*Id.* at 3:25–29). Reed responded to Gray, "If you don't have a warrant, goodbye," and he shut the front door. (*Id.* at 3:32–35). Throughout the entire conversation, Reed remained within the confines of his home.

At this point, Curtis joined Gray at the front door. Gray opened the screen door, while Curtis kicked the door multiple times, eventually breaking it open. (*Id.* at 3:35–3:41). Curtis shouted, "Open the goddamn door!" then drew his firearm with his left hand and pointed it at Reed. (*Id.* at 3:42–44; Doc. 31, Curtis Dep. at 88:16–19). Curtis holstered his firearm and grabbed Reed by the left bicep and pulled him on to the front porch. (Doc. 39-3, Gray Body Cam. at 3:46–48; Doc. 31, Curtis Dep. at 85:12–18).

Gray then grabbed Reed's right wrist and led him into the driveway in front of a parked car and pushed on his chest to back him up against the car. (Doc. 39-3, Gray Body Cam. at 3:48–55).

_____

[1] The Court observes, for purposes of a clear record, that at no point did Gray ask Reed to allow the officers entry into his home. Gray only asked that the other adults come to the front door to speak with him.

Gray instructed Reed to turn around and face the hood of the car. (*Id.* at 3:55–4:17). Reed continued to ask if Gray had a warrant and did not comply with his order. (*Id.*). Gray eventually grabbed Reed's right shoulder and turned him around and patted him down for weapons. (*Id.* at 4:17–4:25).

At this point, an Alexandria Police officer arrived on scene, as well as Campbell County Police supervisors. (Doc. 32, Gray Dep. at 110:11–17; 116:1–10). The officers spoke with Mr. and Mrs. Reed, their daughter Haley, and Haley's boyfriend. (*Id.* at 150:17–152:12). Once they were satisfied that everyone in the home was safe, the officers documented the damage and left the scene. (*Id.* at 153:3–158:8). The whole incident lasted less than fifteen minutes. (Doc. 39-3; Doc. 39-4). No one in the Reed residence was ever charged with any crimes relating to this incident.

Reed timely brought this action against Officers Gray and Curtis, as well as Campbell County, Kentucky, alleging claims for: (1) excessive force; (2) unlawful entry; (3) false arrest; (4) unlawful *Terry* stop; (5) inadequate training; (6) assault and battery; (7) common law false imprisonment; (8) intentional infliction of emotional distress; and (9) punitive damages. (*See* Doc. 1).

### ANALYSIS

Summary judgment is proper where there is no genuine issue as to any material fact and the movant is entitled to a judgment as

7

a matter of law. Fed. R. Civ. P. 56. "In determining whether there exists a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party." *See Swallows v. Barnes & Noble Book Stores*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Reed's four Section 1983 claims against Officers Gray and Curtis must be analyzed under the qualified immunity doctrine.[2] "Government officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009).

### A. Unlawful Entry Claim

The Court first evaluates Plaintiff's unlawful entry claim.

#### i. Constitutional Violation

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

---

[2] Defendants in their official capacities and Campbell County do not enjoy Eleventh Amendment immunity the same way states and state employees do. *See Laborers' Int. Union of N. Am., Local 860 v. Neff*, 29 F.4th 325, 330 (6th Cir. 2022). An official capacity claim is simply "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). To succeed on official capacity claims, Plaintiff must show that the county's policy or custom violated his constitutional rights. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Accordingly, the Court at this juncture only evaluates the claims as it relates to Defendants' individual capacities and dismisses their official capacity claims as redundant to the claim against the County.

unreasonable searches and seizures, shall not be violated." The Supreme Court has said that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980). At the Amendment's "very core stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (internal quotation marks omitted). Thus, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Michigan v. Fisher*, 130 S. Ct. 546, 548 (2009).

"That presumption [of unreasonableness] can be overcome, however, if the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Schreiber v. Moe*, 596 F.3d 323, 329 (6th Cir. 2010) (internal quotation marks omitted). The exigency exception allows an officer to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Fisher*, 130 S. Ct. at 548. The Court cautioned that the officer must have "an objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid." *Id.* (internal quotation marks omitted). "In civil cases, this question is normally left to the jury, but only if there is room for a difference of opinion." *Schreiber*, 596 F.3d at 330 (internal quotation marks omitted).

9

Here, it is undisputed that the officers entered Reed's home without a warrant. It is also undisputed that the constitutionality of Defendants' entry turns on whether there was an exigent circumstance—specifically, the emergency aid exception. *See Fisher*, 130 S. Ct. at 548. The Court must therefore determine whether Defendants had "an objectively reasonable basis for believing that an occupant of the [house] was 'seriously injured or threatened with such injury.'" *Williams v. Maurer*, 9 F.4th 416, 432 (6th Cir. 2021) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)).

The parties spend large portions of their briefs arguing whether this is an anonymous caller case, but, for purposes of these motions, the Court finds this distinction immaterial. Regardless, the 911 call, standing alone, did not provide the officers with an objectively reasonable basis to determine there was an exigent circumstance to justify a warrantless entry. *See Wright v. Bloomfield Tp.*, 12-15379, 2014 WL 5499278, at *9 (E.D. Mich. Oct. 30, 2014) (explaining that when a caller reported that her neighbors were fighting and gave her first name, there were still questions of fact for a jury over whether an exigency existed to justify a warrantless entry).

The Sixth Circuit has made clear that even in situations where the caller identified herself as the victim's fiancé and was inside the residence where an exigency existed, such a situation only

10

justified the police to investigate further. *Thacker v. City of Columbus*, 328 F.3d 244, 254 n.2 (6th Cir. 2003). "Only when the police arrived at the home and observed facts indicative of exigent circumstances, were they justified in entering the home." *Id.; see also United States v. Hensley*, 469 U.S. 221, 232 (1985) (holding that a *Terry* stop is justified when police rely upon a police bulletin only if the bulletin itself is based on reasonable suspicion or independent police corroboration). Instead, the Court must look at the totality of the circumstances. *Wright*, 2014 WL 5499278 at *6.

In the present case, although the 911 caller identified herself as "Jennifer," she did not provide her last name. (Doc. 60-1 at 3:4). The caller provided no information about who was the one yelling and hitting "something" or who inhabited the Reed home. (Doc. 36, Fuller Dep. at 33:24–34:3). She identified herself as a neighbor, who was in her own backyard, and explained that she did not see any exigency first-hand. Furthermore, her assertions were vague at best—she expressed to the 911 dispatcher that she could not determine what was going on. The dispatcher testified there was no way for her to judge the reliability of the caller with the information she provided. (*Id.* at 33:4–8).

11

Defendants learned via the radio that a caller claimed to have heard yelling coming from outside the plaintiff's home.[3] The first name of the caller was never relayed to Defendants over the radio or in subsequent logs by the dispatcher. *See Schreiber*, 596 F.3d at 326 n.1 (relying only on the information the officer had available to him to determine whether an exigency existed, not what the 911 caller said). Accordingly, the 911 call, standing alone, did not provide officers with an objectively reasonable basis to enter Reed's home without a warrant.

The Court next considers other evidence observed by Defendants while investigating the call. Once Defendants arrived at 7 South Cottonwood, none of the caller's assertions were corroborated. The caller reported that the altercation was outside—no one was outside. The caller reported yelling—the area was quiet. The caller reported that someone might be hitting dogs—no dogs were seen in the yard or the house. Defendants peered inside the windows and the interior was not in any form of

_____

[3] The dispatcher testified that the two blotter entries would be visible to the officers on the "screen in their cruisers" for them to read. (Doc. 36, Fuller Dep at 60:3–22). However, Gray testified that pool vehicles, or spare vehicles, were not equipped with computer monitors. (Doc. 32, Gray Dep. at 82:5–16). He cannot remember whether the vehicle he was using on the evening in question was equipped with a monitor. (*Id.*). Similarly, Curtis does not recall whether he received the information contained in the log. (Doc. 31, Curtis Dep. at 60:24–63:5). Moreover, Sargent Sorrell expressed his doubtfulness that the blotter and log information were read by responding officers. (Doc. 33, Sorrell Dep. at 179:17–180:16). Thus, there is a dispute of fact as to whether Defendants were aware of the information contained in the log.

disarray. Gray testified: "Did I see anything? No. Did I hear anything verbally? No." (Doc. 32, Gray Dep. at 100:11-17). Similarly, Curtis testified that he did not observe any physical evidence in the yard that there was any type of altercation before they arrived. (Doc. 31, Curtis Dep. at 71:2-5).

Having observed no evidence that supported a finding of a past or ongoing exigent circumstance, the two officers made their way to the front of the house. Once Reed answered the door, he answered Gray's questions and told him that there had not been an altercation at the home. However, Curtis testified that he could see inside the window that there was a woman who was lingering in the hallway and appeared "standoffish" and "timid." (Doc. 31, Curtis Dep. at 83:12-21). Reed did not give her the opportunity to come to the front door and confirm that she was safe, which both officers testified concerned them, as this is common among domestic abusers. (*Id.* at 83:12-21; Doc. 32, Gray Dep. at 125:12-21). Gray also testified that Reed appeared agitated, (Doc. 32, Gray Dep. at 142:21-143:2), and Curtis wrote in his report that Reed appeared intoxicated. (Doc. 31, Curtis Dep. at 109:3-17). Defendants argue these factors support a finding of exigency.

However, Defendants did not observe anyone in the home who was injured. *Cf. Fisher*, 130 S. Ct. at 549 (holding that when a man is seen bleeding and "going crazy" it is reasonable to enter the home without a warrant under the emergency aid exception);

13

*Thacker*, 328 F.3d at 254 (explaining that it was a "close question," but ultimately holding that when someone was bleeding profusely and the cause of the injury was unexplained, it was objectively reasonable for the police to enter the home to look for other victims and provide protection to paramedics). Such manifestations of violence, which were absent here, tend to support the conclusion that a warrantless entry is appropriate under the exigent circumstance exception.

Recognizing that there were no manifestations of violence here, Defendants cite *Schreiber v. Moe*, 596 F.3d 323 (6th Cir. 2010), to support their argument that an exigency could be inferred from Reed's lack of cooperation. In *Schreiber*, police responded to an anonymous 911 call. *Id.* at 326. The caller was recently talking to the plaintiff's teenage daughter on the phone when the call was suddenly disconnected, and the caller believed the daughter was "getting beat." *Id.* When an officer arrived at the home, he could hear and see Schreiber yelling, but he could not see a teenage girl. *Id.* Schreiber came to the door and shouted expletives at the officer. *Id.* The officer explained that they had gotten a call about his daughter's welfare. *Id.* Schreiber responded that his daughter was fine and attempted to close the door. *Id.* At this point, the officer entered the home to check on the daughter. *Id.*

The Sixth Circuit upheld the officer's warrantless entry under the exigent circumstance exception. The Sixth Circuit found

14

that the loud shouting the officer heard corroborated the 911 call. *Id.* at 330. The Sixth Circuit observed that Schreiber was completely "lacking in self-control" and wrote, "[a] reasonable officer would naturally question why a father, who had just been told that the police suspected his daughter was in danger, would be so hostile and uncooperative." *Id.* at 330-31. The Sixth Circuit explained that although "this case lacks some of the more outward manifestations of violence that often support a finding of exigency," it was "reasonable to believe that Schreiber was about to hurt or had already hurt [his teenage daughter]." *Id.* at 331.

In the present case, Reed's behavior did not rise to the level of Schreiber's. When officers arrived on scene, they heard no yelling or hitting, which failed to corroborate the 911 call. Reed also was not "bombarding" the officers with a slew of profanities. He asked for a warrant, and when the police admitted they did not have one, he retreated into his home.[4] *Id.* at 330.

Reed's decision to exercise his Fourth Amendment rights by refusing to continue to engage in conversation with police does not give rise to the inference of an exigency and allow the police to circumvent the warrant requirement. *See Kentucky v. King*, 563 U.S. 452, 470 (2011) ("Even if an occupant chooses to open the

---

[4] Of course, a jury is entitled to view the body camera footage available and consider Reed's behavior towards the officers when evaluating the reasonableness prong. *See Crabbs v. Pitts*, 817 F. App'x 208, 215 (6th Cir. 2020) (explaining that a court cannot decide from watching a video whether a witness appeared agitated, that is a job for the jury).

door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.").

"At the summary judgment stage, once the relevant set of facts is determined and all reasonable inferences are drawn in favor of the plaintiff, to the extent supported by the record, the question of whether the [officers'] actions were objectively unreasonable is a pure question of law." *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (internal citations omitted). The Court finds that a reasonable jury could conclude that Defendants violated Plaintiff's right to be free from warrantless entry into his home. *See, e.g., id.* at 909; *cf. United States v. Martinez,* 406 F.3d 1160, 1164-65 (9th Cir. 2005); *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir. 1998).

### ii.  Clearly Established

Plaintiff bears the burden of showing that Defendants' unconstitutional conduct violated clearly established law. *See Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). This standard "also require[s] that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. "Thus, when no reasonable [] officer could have concluded that the challenged

16

action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." *Moderwell v. Cuyahoga Cty.*, 997 F.3d 653, 660 (6th Cir. 2021) (internal quotation marks omitted).

The Court finds the Sixth Circuit's reasoning in *Williams v. Maurer* instructive on this point and hereby incorporates and adopts the panel's reasoning by reference. 9 F.4th at 437–38; *see also Smart v. Borough of Bellmawr*, 528 F. App'x 163, 166 (3d Cir. 2013) (reversing the district court's holding that the law was not clearly established whether an officer could execute a warrantless entry upon a report of a physical altercation).

In *Maurer*, the Sixth Circuit relied on *Barton v. Martin*, 949 F.3d 938 (6th Cir. 2020). In *Barton*, an officer made a warrantless entry into a home based on a report that the plaintiff shot a stray cat. *Id.* at 944. The suspect was "inside his home but cooperating with police." *Id.* at 948. The Sixth Circuit held that the warrantless entry violated the Fourth Amendment and explained that "it was clearly established that warrantless entry into a home without an exception to the warrant requirement violated clearly established law." *Id.* at 949. There was not an exigent circumstance to justify entry, and therefore the officer "had no objectively reasonable basis for believing the warrantless entry was supported by exigent circumstances." *Id.* at 950.

17

Therefore, the Court denies the officer Defendants qualified immunity on this claim. But because there are issues for a jury, the Court also denies Plaintiff's motion for summary judgment.

## B. Unlawful Seizure Claim

Reed next brings an improper *Terry* stop claim (Count IV) and a false arrest claim (Count III) against Defendants. It is undisputed that Reed was "seized" within the meaning of the Fourth Amendment when he was pulled out of his home by the officers. *Dunaway v. New York*, 442 U.S. 200, 215–16 (1979). The question is whether the seizure violated the Fourth Amendment.[5]

### i.   Constitutional Violation

The parties, in their briefs, focus heavily on whether the seizure of Reed was a *Terry* stop or an arrest, or, if the seizure began as a *Terry* stop, whether it transformed into an arrest. But the parties' fixation on categorizing the seizure of Reed as one or the other is misplaced. Plaintiff was seized in his home. Thus, the primary question is whether there was an exigent circumstance that justified entry.

The Fourth Amendment draws a hard line at the home. Even with probable cause, it is well-established that officers cannot execute an arrest inside a suspect's home without a warrant.

---

[5] Plaintiff claims in his complaint and deposition that he was handcuffed. (Doc. 1 at ¶ 28; Doc. 34, Reed Dep. at 97:5–7). The body camera video from both officers definitively shows that at no point was he placed in handcuffs. (*See* Doc. 39-3, Gray Body Cam. at 3:46–15:40).

*Payton*, 445 U.S. at 603. The Sixth Circuit has explained this principle further, writing, "*Payton*'s holding that warrantless seizures of persons in their homes violate the Fourth Amendment, absent exigent circumstances, applies to this case regardless of whether the officers at issue were conducting an arrest or an investigatory detention."[6] *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001); *see also Crabbs*, 817 F. App'x at 215–16; *McGraw v. Madison Tp.*, 231 F. App'x 419, 425 (6th Cir. 2007).

Just as exigent circumstances may permit officers to enter a home without a warrant, exigent circumstances may also permit officers to seize people in the home without a warrant. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002); *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). The Sixth Circuit has explained that when warrantless entries are justified by exigent circumstances, officers may be "required to secure all persons therein and to make a protective sweep . . . for the safety of all concerned." *United States v. Elkins*, 732 F.2d 1280, 1285 (6th Cir. 1984).

The Sixth Circuit has also articulated a "general right to detain without reasonable suspicion or probable cause." *Ingram v.*

---

[6] The Sixth Circuit's interpretation of *Payton* is consistent with other circuits. *See Moore v. Pederson*, 806 F.3d 1036, 1054 (11th Cir. 2015) ("Home may be where the heart is, but it cannot be where the government is—at least for purposes of conducting a *Terry*-like stop in the absence of exigent circumstances."); *United States v. Perea-Rey*, 680 F.3d 1179, 1188 (9th Cir. 2012) ("We have held . . . that the *Terry* exception to the warrant requirement does not apply to in-home searches and seizures."); *United States v. Myers*, 308 F.3d 251, 258 (3d Cir. 2002) ("*Terry* has never been applied inside a home.").

*City of Columbus*, 185 F.3d 579, 591 (6th Cir. 1999). In clarifying this assertion, the Sixth Circuit wrote that it has "occasionally permitted the use of such tactics by officers to detain private individuals for investigative purposes" but it has "done so only where the officers making the seizures acted out of a justifiable fear of personal safety." *Id.* at 591–92. "[E]ven absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest." *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011) (citing *Michigan v. Summers*, 452 U.S. 692, 704–05 (1981)). The Supreme Court has explained that these types of detentions must be "limited" and "routine." *Summers*, 452 U.S. at 702–03, 705.

The merits of Plaintiff's unlawful seizure claim will turn on whether Defendants lawfully entered Reed's home. Of course, if Defendants were not lawfully inside Reed's home, then there was no "justifiable fear of personal safety," and this would be an impermissible seizure in violation of the Fourth Amendment. *See Elliott v. Lator*, No. 04-74817, 2006 WL 1806475, at *9 (E.D. Mich. June 28, 2006), *appeal dismissed*, 497 F.3d 644 (6th Cir. 2007) ("It is only a short step from this ruling to the further conclusion that Plaintiffs were unlawfully seized in the immediate aftermath of Defendants' unlawful entry into their home.").

However, if a jury finds that there was an exigent circumstance to justify entry, then it may have been reasonable

20

for the officers to temporarily detain Reed. *See Ingram*, 185 F.3d at 591-92. But the officers' detainment of Reed is still subject to the "reasonableness" requirement, which is appropriately evaluated by the jury. *See Bletz*, 641 F.3d at 755 (holding that a woman at the scene of a shooting who was not a suspect was properly handcuffed and placed in a police car while the officers secured the scene, but that it was a jury question whether it was for a reasonable amount of time).

For the above reasons, the false arrest claim survives Defendants' motion for summary judgment. However, the Court dismisses Count IV, the unlawful *Terry* stop claim, because it is duplicative of Count III, the false arrest claim.

### ii.  *Clearly established*

The Supreme Court has clearly held that arrest warrants are needed to seize someone in his or her home, even if an officer has probable cause. *Payton*, 445 U.S. at 603. The Sixth Circuit has also clearly held that absent an exigent circumstance, police may not detain someone inside their home. *Saari*, 272 F.3d at 809. This was clearly established at the time of Gray and Curtis's alleged violation. *See Wright*, 2014 WL 5499278 at *14. Accordingly, the Court denies the officer defendants qualified immunity, and also denies Plaintiff's motion for summary judgment on this claim.

## C.  Excessive Force Claim

Plaintiff and Defendants have also cross-moved for summary judgment on Plaintiff's excessive force claim (Count I). The Fourth Amendment protects individuals from "physically intrusive governmental conduct" that arises "in the context of an arrest or investigatory stop . . . ."[7] *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Plaintiff claims that Gray and Curtis applied unnecessary and excessive force in violation of his Fourth Amendment rights when they broke down his door, brandished their weapons when they entered his home,[8] and grabbed him and forced him up against a car in the driveway.

---

[7] Plaintiff makes an Eighth and Fourteenth Amendment claim of excessive force in his complaint. (Doc. 1 at ¶ 39). "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham*, 490 U.S. at 394. Eighth Amendment claims are reserved for those convicted of a crime. *Leary v. Livingston Cty.*, 528 F.3d 438, 443 (6th Cir. 2008). The Fourteenth Amendment applies when a citizen does not fall clearly within either category. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Since that is not the case here, Plaintiff's excessive force claim, to the extent it is based on the Eighth and Fourteenth Amendments, is dismissed.

[8] It is undisputed that Curtis was the only officer to draw his firearm during the incident. (Doc. 31, Curtis Dep. at 88:12–89:6; Doc. 32, Gray Dep. at 106:6–109:10; *see also* Doc. 41-1 at 18 (referring only to Curtis as the officer who drew his firearm)). Gray never brandished his firearm; therefore, he did not threaten Reed with deadly force. Where multiple officers are alleged to have violated the plaintiff's Fourth Amendment rights, each officer's conduct must be analyzed individually. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Id.* (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). "As a general matter, [an officer's] mere presence during [an] altercation, without a showing of some direct responsibility, cannot suffice to subject them to liability."

*i.   Constitutional Violation*

Under the Fourth Amendment, "the 'reasonableness' of a particular seizure depends not only on *when* it is made, but also *how* it is carried out." *Id.* at 395. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The "extent of the injury inflicted is not crucial to an analysis of a claim for excessive force" but rather the Court looks "to whether 'gratuitous violence' has been inflicted." *Coley v. Lucas Cty.*, 799 F.3d 530, 539 (6th Cir. 2015) (internal quotations omitted).

In this reasonableness analysis, the Court considers three factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *Graham*, 490

---

*Burgess*, 735 F.3d at 475. To establish that an officer not directly involved owed a duty of care, it must be shown that the officer "observed or had reason to know that excessive force would be or was being used" and "had both the opportunity and the means to prevent the harm from occurring." *Id.* First, Gray did not actively participate in the threat of deadly force. Second, it is undisputed that Gray is not a supervisor of Curtis. Third, Curtis brandished his firearm for a matter of seconds. It cannot reasonably be said that Gray had the time to perceive what was going on and intercede to stop it. Accordingly, Gray cannot be held personally liable for the use of excessive force related to Curtis's drawing of his service weapon.

U.S. at 396). "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citations omitted).

However, simply put, if a jury finds that Defendants unlawfully entered Reed's home, then any force used is deemed excessive. *See Maurer*, 9 F.4th at 440 ("The use of any amount of force to effectuate this unconstitutional action constituted unreasonable 'gratuitous violence.'"); *see also Hickey v. Hayse*, 188 F. Supp. 2d 722, 728 (W.D. Ky. 2001) ("Of course, if Defendant[s] had no right to be inside the home, then [they] had no right to use force"). This claim will therefore hinge on whether Defendants unlawfully entered Reed's home.

### *ii.   Clearly Established*

The Supreme Court has held that the use of unreasonable force while effectuating the "seizure of a free citizen" violates the Fourth Amendment. *Graham*, 490 U.S. at 396. The reason being "there is simply no governmental interest justifying gratuitous violence." *Walters v. Stafford*, 317 F. App'x 479, 491 (6th Cir. 2009)(citing *Phelps v. Coy*, 286 F.3d 295, 302 (6th Cir. 2002)).

It is clearly established that any use of force effectuated from an unlawful entry is considered "gratuitous force" and is therefore deemed excessive. *Maurer*, 9 F.4th at 440. Accordingly, the Court denies the officer defendants qualified immunity, and also denies Plaintiff's motion for summary judgment.

### D. *Monell* Claim

Reed next claims that Campbell County is responsible for the unlawful entry, false arrest, and excessive use of force because it is the unwritten policy of the County to use unreasonable force and intrude upon the residences of citizens without warrants.

Section 1983 provides a cause of action against any "person" who, under color of law, "subjects" someone else to the violation of his constitutional rights. The "person" may be a county. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) ("Local governing bodies, therefore, can be sued directly under § 1983 . . . .") (footnote omitted). It has long been recognized that a county government is not automatically liable for "an injury inflicted solely by its employees or agents." *Id.* at 694. Congress only intended for counties to be liable when "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691.

The plaintiff must "point to a municipal 'policy or custom' and show that it was the 'moving force' behind the constitutional

violation." *Crabbs*, 800 F. App'x at 336 (quoting *Monell*, 436 U.S. at 694).

Reed alleges a custom of inadequate training. To prove this claim, the plaintiff must show that: "(1) the [County]'s training program was inadequate for the tasks that the officers must perform; (2) the inadequacy was the result of the [County]'s deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019).

Turning to the training materials in question, Campbell County's manual has a section designed to train officers how to respond to domestic violence calls and educate them on the contours of the exigent circumstance exception to the warrant requirement. The materials state: "In response to a domestic violence call, officers may enter a dwelling without consent or warrant when there is reasonable belief that a person within is in need of immediate aid." (Doc. 48-1 at 2). A second definition of exigent circumstances is proscribed in another section of the manual, stating: "Circumstances that would cause a reasonable person to believe that a particular action is necessary to prevent physical harm to an individual, the destruction of relevant evidence, the escape of a subject, or some other consequence improperly frustrating legitimate law enforcement efforts." (Doc. 48-2 at 1).

The County has no written policy defining "immediate aid." (Doc. 33, Sorrell Dep. at 50:11-54:1).

When reviewing the body camera footage, Chief Sorrell testified "based on . . . the policies that we have, I cannot find fault in the officers' decision to believe that they were justified in entering the home at that time." (*Id.* at 134:11-15). Reed argues that the testimony of Chief Sorrell shows that Gray and Curtis were acting in "full conformity with county custom policy and practice policy when [they] forced entry into the Reed home simply on the basis that the 911 call was couched as a 'domestic call.'" (Doc. 48 at 24).

The plaintiff's argument is unpersuasive. First, the policy does nothing more than set out the well-established standard of a warrantless entry in the face of exigent circumstances. The objective reasonableness standard cannot be precisely defined to encompass every applicable situation an officer may encounter. The County cannot be faulted for training its officers on the appropriate legal standard. Even if the officers misapplied it in this case, Plaintiff has simply not produced sufficient evidence to causally link the training materials to the alleged constitutional violation.

Second, Plaintiff has failed to produce any evidence supporting the deliberate indifference prong. This imposes "a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997). The plaintiff must show that the "risk of a constitutional violation arising as a result of" the inadequate training is "plainly obvious." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). To make that showing, a plaintiff must allege either "prior instances of unconstitutional conduct demonstrating that the [County] had notice that the training was deficient and likely to cause injury but ignored it," or "evidence of a single violation of federal rights, accompanied by a showing that the [County] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Jackson*, 925 F.3d at 836.

Reed has not alleged other prior instances of Campbell County engaging in unconstitutional conduct relating to warrantless entries in domestic violence situations. Similarly, even though domestic violence calls unfortunately qualify as "recurring situations," the Court finds unpersuasive Plaintiff's argument that training materials failed to train officers. Therefore, Plaintiff has failed to show that Campbell County acted with deliberate indifference as to the training of its officers responding to domestic violence calls.

### E.    State Law Claims

Plaintiff brings three state law claims against Defendants in their individual and official capacities: (1) assault and battery; (2) false arrest; and (3) intentional infliction of emotional distress.[9] Kentucky state law provides qualified immunity, although the Court notes the same "objective reasonableness test" utilized in federal Section 1983 actions, applies under Kentucky's qualified official immunity doctrine.[10] *Yanero*, 65 S.W.3d at 523.

### i.    Assault and Battery

Kentucky law defines an assault as "any attempt or offer with force or violence to do a corporeal hurt to another, whether from

---

[9] Gray and Curtis, in their official capacities, and Campbell County are entitled to immunity on the state law claims. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) ("When an officer or employee of a governmental agency is sued in his/her representative capacity the officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled . . . ."); *see also Lexington-Fayette Urban City. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004) ("Kentucky counties are cloaked with sovereign immunity.").

[10] Officer defendants are afforded qualified immunity in their individual capacity for "good faith judgment calls made in a legally uncertain environment." *Yanero*, 65 S.W.3d at 522. Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment [;] (2) in good faith; and (3) within the scope of the employee's authority." *Id.* It is undisputed that the Defendants' conduct was within the scope of their authority and was a discretionary function. Once Defendants have shown *prima facie* evidence "that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff." *Id.* at 523. By direct or circumstantial evidence, Plaintiff must then establish that the discretionary act was performed in "bad faith," rather than "good faith." The same "objective reasonableness test" utilized in federal Section 1983 actions, applies under Kentucky's qualified official immunity doctrine. *See id.*

malice or wantonness, with such circumstances as denote at the time an intention to do it coupled with the present ability to carry such intention into effect." *May v. Commonwealth*, 285 S.W.2d 160, 163 (Ky. 1955). Similarly, Kentucky law defines a battery as "an assault whereby any force, however slight, is actually applied to the person of another, directly or indirectly." *Id.* Given that the above analysis finds there are questions of fact regarding whether the officers appropriately seized Reed, the Court denies Plaintiff and Defendants' cross-motions for summary judgment on the assault and battery claim.

### ii.  False Arrest

Kentucky cases define false imprisonment as "any deprivation of liberty of one person by another or detention for however short a time without such person's consent and against his will." *Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. Ct. App. 2001); *see also Grayson Variety Store, Inc. v. Shaffer, Ky.*, 402 S.W.2d 424, 425 (Ky. 1966). The restraint must be wrongful, improper, or without reasonable justification, authority, or privilege. *Banks*, 39 S.W.3d at 479. For the reasons already explained, the Court declines to award summary judgment to either party on this claim.

### iii. Intentional Infliction of Emotional Distress

Plaintiff's claim for intentional infliction of emotional distress claim (Count VIII) will be dismissed. Plaintiff has abandoned this claim, only asking this Court to award summary

judgment up through Count VII. (Doc. 41-1 at 21; Doc. 48 at 25).
Plaintiff also subsequently failed to adequately address this
claim in his response to Defendants' motion for summary judgment.
*See Hicks v. Concorde Career Coll.,* 449 F. App'x. 484, 487 (6th
Cir. 2011) (holding that a district court properly declines to
consider the merits of a claim when a plaintiff fails to address
it in a response to a motion for summary judgment).

### F. Punitive Damages

Punitive damages are available in Section 1983 actions when
the defendant's conduct "is shown to be motivated by evil motive
or intent, or when it involves reckless or callous indifference to
the federally protected rights of others." *Smith v. Wade*, 461 U.S.
30, 56 (1983). Conduct that rises to the level of deliberate
indifference necessary to establish liability under Section 1983
does not necessarily rise to the level of "callous indifference"
that warrants punitive damages. *See id.*; *Gibson v. Moskowitz*, 523
F.3d 657, 664 (6th Cir. 2008) (citing *Coleman v. Rahija*, 114 F.3d
778, 787 (8th Cir. 1997)). Thus, even where there is sufficient
factual support to raise a genuine issue of material fact with
respect to liability under Section 1983, it does not follow that
such factual support exists for an instruction on punitive damages.

The Court declines to award punitive damages for the Section
1983 claims. The facts here are not sufficiently egregious to
justify a holding that the officers' conduct rose to the level of

31

callous indifference. The officers were responding to a report of domestic violence and were met by Plaintiff, who did not allow the other occupants of the home to come to the door and speak with the officers. The officers reacted, and while it is a question for the jury whether their reaction was objectively reasonable, it was a judgment call that needed to be made quickly. [11] Accordingly, Reed's request for punitive damages is denied, and Count IX dismissed.

Therefore, for the reasons stated above, **IT IS ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment, (Doc. 41), be, and is hereby **DENIED.**

2. Defendants' Motion for Summary Judgment, (Doc. 39), be, and is hereby, **GRANTED IN-PART** and **DENIED IN-PART**. It is **GRANTED** as to Counts IV, V, VIII, and IX and **DENIED** as to Counts I, II, III, VI, and VII.[12]

3. Parties shall meet and confer and file a joint status report proposing mutually available trial dates in the spring of 2023. The parties shall file the proposed trial dates **ON OR BEFORE SEPTEMBER 9, 2022.**

This 17th day of August 2022.



Signed By:

_William O. Bertelsman_   WOB

**United States District Judge**

---

[11] Punitive damages under Kentucky state law are limited to situations involving oppression, fraud, or malice. KRS § 411.184(1)(c). The Court also concludes that the record does not support a finding that Defendants acted with the malice required to support a recovery of punitive damages.

[12] All claims against the Officer Defendants in their official capacities are dismissed. *See supra* notes 2 & 9.